6 F.3d 829
 303 U.S.App.D.C. 370
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
William C. LATHAM, Petitioner,
v.
NATIONAL TRANSPORTATION SAFETY BOARD and Administrator,
Federal Aviation Administration, Respondents.
 No. 92-1187.
 United States Court of Appeals, District of Columbia Circuit.
 Sept. 28, 1993.
Rehearing Denied Nov. 17, 1993.
 
 Before: SILBERMAN, WILLIAMS, and RANDOLPH, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This appeal was considered on the record from the National Transportation Safety Board and on the briefs filed by the parties and arguments of counsel. After full review of the case, the court is satisfied that appropriate disposition of the appeal does not warrant an opinion. See D.C.Cir.Rule 14(c). For the reasons stated in the accompanying memorandum it is
 
 
 2
 ORDERED and ADJUDGED that the case is remanded to the Board.
 
 
 3
 The clerk is directed to withhold issuance of the mandate herein until seven days after the disposition of any timely petition for rehearing. See D.C.Cir.Rule 15.
 
 MEMORANDUM
 
 4
 Petitioner, William C. Latham, is a licensed private pilot. He appeals an order of the National Transportation Safety Board that approved the suspension of his license for seven days. Because the Board's reasoning is too obscure for us readily to assess whether the decision is supported by substantial evidence and whether the Board provided adequate notice of the nature of the claim against Latham, we remand the case to the Board.
 
 
 5
 * * *
 
 
 6
 On November 11, 1987, Latham flew from New Orleans to the vicinity of Washington, D.C., carrying three passengers. In the late afternoon, he drew close to Manassas Municipal Airport, a small facility with two runways but no control tower. Latham, who knew that it had snowed in the Washington area that day and that National Airport had been closed briefly during the morning, attempted to reach Manassas Airport on "Unicom", a radio frequency that aircraft use to communicate with commercial operations at airports. His Unicom call was answered by Joseph Gardner, an employee of a private company that sold fuel and performed other services at the airport, who said something to the effect that he thought the runways were closed for snow removal. Latham reports that he replied, "I will just circle up here until the runway is completely open and the plow leaves the runway and then I will land." Joint Appendix ("J.A.") 50. The NTSB concluded that he did just that:
 
 
 7
 [T]he unrebutted testimony indicates that, in landing at Manassas: respondent circled until personnel and equipment were well off the runways; he then made a low run to ensure that conditions on the ground were safe; and respondent only landed upon finding that the runway was free of people, free of snowplows, and free of ice. The landing was routine.
 
 
 8
 J.A. 72-73.
 
 
 9
 After an investigation, however, the Federal Aviation Administration concluded that Manassas Airport had been officially closed by a Notice to Airmen ("NOTAM") when Latham landed there. The Order of Suspension that became the FAA's complaint in this case told Latham that he had "landed at Manassas Municipal Airport when the airport had been NOTAMed closed and after being informed that the airport had been temporarily closed due to snow removal", that the NOTAM in question had been issued before he had begun his flight, and that his flight had been "careless so as to endanger the life or property of another". On the basis of these factual allegations, the FAA determined that Latham had violated three federal aviation regulations: 14 CFR Sec. 91.91(b) (now redesignated 14 CFR Sec. 91.137(b)), which forbids operating an aircraft within an area closed by a NOTAM; 14 CFR Sec. 91.5 (now redesignated 14 CFR Sec. 91.103), which requires pilots to familiarize themselves with all available information before beginning a flight; and 14 CFR Sec. 91.9 (now redesignated 14 CFR Sec. 91.13(a)), which forbids operating an aircraft "in a careless or reckless manner so as to endanger the life or property of another". See J.A. 1-2. The FAA suspended Latham's Private Pilot Certificate for 60 days.
 
 
 10
 Latham appealed the suspension. After an evidentiary hearing, an Administrative Law Judge for the NTSB held that Latham had indeed violated all three regulations. Remarkably, the ALJ upheld even the charge based on Sec. 91.5, despite explicitly finding that the FAA had failed to prove that the NOTAM had issued prior to Latham's take-off; it was enough that the NOTAM "may have been issued" before the commencement of the flight. J.A. 82 (emphasis added). Because of Latham's long record of flight safety, however, the ALJ decreased his suspension from 60 days to 45 days.
 
 
 11
 When Latham appealed to the NTSB itself, the FAA prudently withdrew the Sec. 91.5 charge. For its part, the NTSB overturned the Sec. 91.91(b) charge, concluding that the evidence did not show that any NOTAM closing Manassas Airport had been issued. But the NTSB upheld the Sec. 91.9 charge, agreeing with the ALJ that Latham had been dangerously careless. The Board reduced his suspension to seven days.
 
 
 12
 In his current appeal, Latham makes two basic points. First, he asserts that the evidence was insufficient to show either that he was careless or that his actions were potentially dangerous. Second, he argues that the FAA's complaint did not give him notice of the theory on which his suspension ultimately was based.
 
 
 13
 In assessing Latham's first point, we are not to substitute our judgment for that of the NTSB. We are to set aside the agency's factual findings only if they are unsupported by substantial evidence. 49 U.S.C. app. Sec. 1486(e); 49 U.S.C. app. Sec. 1903(d); 5 U.S.C. Sec. 706(2)(E). Still, we will set aside those findings if the agency could not fairly and reasonably arrive at them on the basis of the evidence before it. Chritton v. National Transp. Safety Bd., 888 F.2d 854, 856 (D.C.Cir.1989).
 
 
 14
 Assuming, as we must, that Manassas Airport was not closed when Latham landed at it, the evidence supporting the Sec. 91.9 charge is exceedingly thin. It appears to rest entirely on the testimony of Stephen Isaacs, an expert witness who asserted that Latham should have pursued one of two courses after his conversation with Gardner: either he should have radioed the Leesburg Flight Service Station to determine the status of Manassas Airport or he should simply have gone to a different airport. J.A. 40.
 
 
 15
 The ALJ apparently credited this testimony, though he garbled it in issuing his decision. According to the ALJ, "A reasonably prudent pilot carrying passengers should have inquired further at some other airport in the vicinity [--] Dulles, which was just ten minutes away [--] as to whether or not he could land at Manassas." J.A. 80. There is, of course, no support in the record for this conclusion, which conflates the two options Isaacs advanced: the pilot should either have gone to Dulles or called Leesburg. The NTSB, however, avoided this confusion; in upholding the carelessness charge, it agreed that Latham "should have made further inquiry (of the flight center, for example) concerning conditions at the airport." J.A. 72.
 
 
 16
 Standing alone, Isaacs's statement about the petitioner's options would support this conclusion. But this passage of Isaacs's testimony did not stand alone. The record makes clear that Isaacs assumed the existence of a NOTAM. See, e.g., Tr. 54 (referring to the NOTAM "pertinent to this particular incident"); Tr. 78 (asserting that Manassas Airport had been NOTAMed closed when Latham landed there); Tr. 80 (stating belief that NOTAM had been filed); Tr. 84 (saying that Latham should have known about the NOTAM). If one eliminates the NOTAM from the picture, it is not clear that Isaacs would have concluded that the petitioner was careless, or that any carelessness was potentially dangerous.
 
 
 17
 To be sure, whether Latham's failure to make further inquiry was careless cannot depend on whether a NOTAM was in effect. The rule cannot be that one must make an inquiry if, but only if, it will reveal the existence of a NOTAM; the whole point of an inquiry is that one does not know in advance what it will yield. Thus the risks inherent in landing at a closed airport, or in landing uninformed about special conditions short of closure that a NOTAM might have disclosed, may be such that it would be perfectly coherent to conclude that Latham's failure to call Leesburg was careless and dangerous even though, by hypothesis, there was no NOTAM and hence a call to Leesburg would not have changed his actions at all. Cf. Haines v. Dep't of Transportation, 449 F.2d 1073, 1076 (D.C.Cir.1971).
 
 
 18
 The problem is that Isaacs's testimony, taken as a whole, does not seem to adopt this position. For one thing, Isaacs's recurrent allusion to an unproven NOTAM suggests that the NOTAM was a premise of his negative appraisal of Latham's conduct. Further, Isaacs's response to a hypothetical appears inconsistent with the line of reasoning outlined above. The hypothetical ran as follows:
 
 
 19
 Suppose it's at night. The airport management had left. It's a cold and dreary night and there is plenty of snow coming down, and that rotating beacon is on and those lights are on, and you've got five inches of snow on the runway, and ... an aircraft comes in to land and he sees that everything seems to be operating.
 
 
 20
 J.A. 61. In such a situation--more dangerous in most respects than the one that actually faced Latham--Isaacs apparently saw no need for the pilot to make any inquiry about the status of the airport. He responded that a prudent pilot "would make an approach to the runway and make his appraisal based upon ... [w]hat he could see or what he couldn't see." J.A. 62. Isaacs's response to this hypothetical creates great uncertainty about exactly why he believed that Latham's failure to call the Leesburg Flight Service Station was careless.
 
 
 21
 The record is also murky about whether Latham needed to initiate any inquiry in order to learn whether a NOTAM was in effect for Manassas Airport. Because he was flying under instrument flight rules for most of his trip, Latham was in radio contact with the air traffic control until a short time before his conversation with Gardner on Unicom. Tr. 100-03, 116. As a result, Latham observed at his hearing, "if there was any kind of an emergency, air traffic control could have called me." Tr. 112. The more likely it was that air traffic control would have notified Latham of any NOTAM about Manassas Airport on its own initiative, the less reason Latham would have had to radio Leesburg.
 
 
 22
 Finally, the record is unclear as to whether the continued functioning of the rotating beacon signalled that Manassas was open. Latham thought--but was "not absolutely positive"--that when an airport is closed federal aviation regulations "require[ ] that all facilities which relate to the use of that airport by incoming traffic be turned off." Tr. 108. He added that the rotating beacon certainly "could" be turned off "because that's the flag to incoming traffic." Id. In rebuttal, Isaacs implied that Latham was wrong about the federal regulations; he also indicated that at some airports (but evidently not all) the rotating beacon is controlled by a photoelectric cell or a clock timer, and might not be shut off even when the airport is closed. Tr. 123. Isaacs's testimony thus suggested that at some airports, possibly including Manassas, the rotating beacon would indeed not function if the airport were closed. An explanation by the Board might usefully clarify the context of Latham's decisions.
 
 
 23
 Latham's second point, about the inadequate notice provided by the complaint against him, also raises serious questions. NTSB precedent makes clear that Sec. 91.9 charges are often merely derivative, containing no content independent of the other charges. When a pilot violates specific "operational" federal aviation regulations--by flying too low, say--the FAA frequently adds a general carelessness charge to the charges stemming from the specific regulations. If the FAA proves the specific violations, no separate proof of carelessness or danger is required. See, e.g., Busey v. Pritchett, Order EA-3271, 1991 NTSB LEXIS 30, at * 10 n. 17. Conversely, if the FAA fails to prove the specific violations, the carelessness charge fails as well. See, e.g., Adm'r v. Graves, 3 NTSB 3900, 3904 n. 8 (1981). In any case, a derivative charge of carelessness does not support any additional sanction. See, e.g., Adm'r v. Silvernail, 2 NTSB 191, 193 (1973). As a result, when a charge of carelessness is merely derivative, counsel are well advised to focus their efforts on the specific regulations that allegedly have been violated.
 
 
 24
 Because charges of carelessness sometimes are not merely derivative, however, this response can lead to trouble. Accordingly, NTSB precedent calls upon the FAA to make clear when it intends allegations of carelessness to stand on their own. "Where the Administrator intends for the Sec. 91.9 violation to be treated as independent of the other charges," the NTSB has announced, "he should describe in the complaint[ ] the specific factual underpinning for the Sec. 91.9 charge." Engen v. MacGlashan, Order EA-2422, 1986 WL 82519, at * 8 n. 9, 1986 NTSB LEXIS 96, at * 8 n. 9. Recent cases indicate that the NTSB does not always insist upon this policy, see Del Balzo v. Murphy, Order EA-3935, 1993 WL 275315, 1993 NTSB LEXIS 145 (July 5, 1993), but the agency has failed to explain how to distinguish a derivative carelessness charge from an independent one, or how, if it fails to enforce the MacGlashan policy, the respondent can be said to have received the notice required by federal aviation law, 49 U.S.C. app. Sec. 1429(a), and by the Administrative Procedure Act, 5 U.S.C. Sec. 554(b)(3).
 
 
 25
 The record suggests that Latham's counsel, at least, considered the carelessness charge here to be merely derivative. See, e.g., Tr. 63 (calling proof of NOTAM "crucial to the charges"); Tr. 134 (saying that complaint requires FAA to prove NOTAM's existence). This understanding of the complaint against Latham seems eminently reasonable in light of MacGlashan and the FAA's routine practice of tacking derivative carelessness charges onto its other charges.
 
 
 26
 It is true that the factual allegations of the complaint contained one clause that was not necessary to support either the Sec. 91.5 charge or the Sec. 91.91(b) charge. "Pursuant to the above-described flight," paragraph 3 told Latham, "you landed at Manassas Municipal Airport when the airport had been NOTAMed closed and after being informed that the airport had been temporarily closed due to snow removal." J.A. 1 (emphasis added). But this allegation seems directed entirely toward the Sec. 91.91(b) charge, just as the next paragraph seems directed entirely toward the Sec. 91.5 charge. The italicized portion is most naturally understood as an effort to support a heightened sanction for a willful violation of the regulation forbidding disobedience of a NOTAM, not as an effort to provide an independent basis for a Sec. 91.9 charge.
 
 
 27
 The FAA cites two NTSB decisions indicating that it need not be very specific in alleging carelessness. Adm'r v. Harris, 1 NTSB 467 (1968); Adm'r v. Black, Order EA-2936, 1989 NTSB LEXIS 78. But in both these cases, the Administrator apparently was alleging only violations of Sec. 91.9, and so there was no possibility that the carelessness charges were derivative.
 
 
 28
 The FAA also argues that if Latham wanted a more specific statement of the factual basis of the carelessness charge, he should have filed a motion to that effect. Resp.Br. at 20. But in light of the Board's decision in MacGlashan it is unclear why Latham should have considered it likely that the Sec. 91.9 charge was anything other than derivative. Under the circumstances, he appears to have had no reason to move for a more definite statement.
 
 
 29
 At the hearing before the ALJ, the FAA may have given some hints that it did not consider the Sec. 91.9 charge to be merely derivative. But aside from one question posed to Isaacs, see Tr. 76, the principal hint to this effect came during closing arguments (where Latham's counsel greeted it with the observation that the FAA seemed to be trying to change its complaint). See Tr. 133-34. Given MacGlashan and the FAA's practice of using Sec. 91.9 charges as mere spin-offs, we are not persuaded that the FAA has met the statutory notice requirements.
 
 
 30
 Given the obscurity of the record as to the existence of substantial evidence in support of the charge and as to the adequacy of notice, we remand the case to the Board so that it may, if it believes the evidence in fact substantial and notice adequate, clarify its position on those points.
 
 
 31
 So ordered.